## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **BARRETTE OUTDOOR LIVING, INC.,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**INTEGRITY COMPOSITES, LLC, et al.,** )<br>)<br>**Defendants.** )<br>_____ )<br>)<br>**INTEGRITY COMPOSITES, LLC, et al.,** )<br>)<br>**Third-Party Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**EATON PEABODY, P.A. et al.,** )<br>)<br>**Third-Party Defendants.** ) | **2:20-cv-00213-JDL** |

## ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION IN LIMINE

Plaintiff Barrette Outdoor Living, Inc. ("Barrette") filed this action on June 17, 2020, against Integrity Composites, LLC ("Integrity Composites"), Integrity Holdings, LLC ("Integrity Holdings"), and Jeffrey True, the Manager of Integrity Holdings and President of Integrity Composites.[1] In its Complaint, Barrette asserts claims for breach of contract, intentional misrepresentation, and negligent

---

[1] Except where it is necessary to refer to one of these Defendants individually, I refer to Integrity Composites, Integrity Holdings, and Jeffrey True collectively as "Integrity."

misrepresentation arising out of a transaction in which Barrette purchased Integrity Composites' intellectual property assets (ECF No. 1).

Integrity has brought a Third-Party Complaint against Eaton Peabody, P.A. and Alfred C. Frawley III, Esq. (ECF No. 12).[2]  Integrity alleges that at the time it conveyed its intellectual property assets to Barrette, it hired Frawley and reasonably relied on him to oversee the intellectual property aspects of the deal with Barrette. Integrity contends that had it known that Frawley had misrepresented the status of two patent applications that were included in the transaction, it would not have included inaccurate information about the applications in the Asset Purchase Agreement.  Integrity's Third-Party Complaint asserts claims for legal malpractice, negligent misrepresentation, and breach of fiduciary duty, and seeks (1) indemnification for any damages that Barrette may be awarded against Integrity, (2) an award of all fees and costs incurred in defending against Barrette's action, (3) an award of its fees and costs associated with bringing its Third-Party Complaint, (4) an award of its fees and costs associated with opposing this motion, and (5) an award of punitive damages.

Eaton Peabody has filed a Motion for Summary Judgment (ECF No. 95) on all counts of Barrette's Complaint, arguing that it is entitled to summary judgment because Barrette will be unable to sustain its burden of proof as to damages.  Eaton Peabody also moves for summary judgment on Integrity's Third-Party Complaint, conceding that Integrity may be able to recover fees and costs reasonably expended

---

[2]  I refer to the Third-Party Defendants, Eaton Peabody and Frawley, together as "Eaton Peabody," except where it is necessary to refer specifically to these parties individually.

as a result of defending against Barrette's action, but arguing that Integrity is not entitled to additional attorney fees, costs, or punitive damages related to its Third-Party Complaint.  Eaton Peabody also concedes liability for Frawley's misconduct and requests that the Court grant summary judgment against it as to liability on all Counts of Integrity's Third-Party Complaint.

Eaton Peabody has also filed a Motion in Limine (ECF No. 79), which seeks to exclude the testimony of Barrette's President Jean desAutels, arguing that he should not be permitted to offer lay opinions as to the value of the patent applications because he is not an expert and because his opinions are conjectural and speculative.  Oral argument on the Motion for Summary Judgment and Motion in Limine was held on January 19, 2023 (ECF No. 111).

## I.  FACTUAL BACKGROUND

The parties have submitted stipulated facts to the Court (ECF No. 93), as well as separate supporting statements of material facts (ECF Nos. 95-2, 100-2, 101-1, 107-1, 108-1).[3]  The following undisputed facts are drawn from these documents.

Barrette is a corporation that manufactures, assembles, and sells various types of fencing, railing products, decking, and "other outdoor products."  ECF No. 93 at 2, ¶ 1.  Jean desAutels has been the President of Barrette since 2010.  Integrity

---

[3]  In its Response (ECF No. 107-1) to Barrette's Statement of Additional Material Facts, Eaton Peabody includes a "Reply Statement of Material Facts," consisting of twelve additional statements of fact that it contends are undisputed.  I decline to consider these for the purpose of summary judgment because, in keeping with District of Maine Local Rule 56(d), a party may not include additional facts in a reply to an opposition to summary judgment without leave of the Court.  *See Currier Builders, Inc. v. Town of York,* No. 01-68-PC, 2002 WL 1146773, at *5 (D. Me. May 30, 2002) ("[N]umerous decisions of this court have held that new factual assertions submitted with a reply to the opposition to a motion for summary judgment in the absence of a request for leave to do so will be disregarded by the court.").

Composites is a limited liability company that manufactures and sells decking products under the brand name "DuraLife."  Integrity Holdings is a limited liability company that invests in a variety of businesses, including operating companies, real estate, and timberland holdings.  Jeffrey True is the Manager of Integrity Holdings and the President of Integrity Composites. Eaton Peabody is a Maine law firm organized as a professional association, and Frawley was employed and affiliated with Eaton Peabody as an attorney between 2012 and 2021.

In November 2017, Integrity began to manufacture and sell a component of a deck installation system known as the "DuraLife Step-Clip," which was advertised as patent-pending.  ECF No. 101-1 at 10, ¶ 3.  Integrity also owned a "Competitor Step-Clip" product, which was functionally similar to the DuraLife Step-Clip but also worked on competitors' deck installation systems.  Integrity had not taken steps to produce or sell the Competitor-Step Clip product.

## A.    Frawley's Preparation and Filing of Integrity's Patent Applications

Eaton Peabody, in or around 2016, represented to the public on its website that it was capable of preparing and prosecuting patent applications for clients and listed Frawley as a "[r]elated professional" on that page.  ECF No. 100-2 at 11-12, ¶ 1.  None of the professionals listed, including Frawley, were registered to prosecute patent applications before the U.S. Patent and Trademark Office ("USPTO"), and Frawley was never a member of the patent bar.  Historically, Frawley would refer utility patent work to counsel at another law firm, and prior to the patent applications at

issue in this case, Frawley had never prepared or filed a patent application with the USPTO.

In late 2016, Integrity asked Frawley—who regularly worked with the company on intellectual property matters—to file a patent application for the DuraLife Step-Clip (the "D206 patent application") with the USPTO.  Although Frawley had not previously prepared or filed patent applications, Frawley advised True in November 2016 that Integrity should file for a design patent, rather than a utility patent, on the company's DuraLife step-clip technology and stated that "we [Frawley] are preparing a design patent."  ECF No. 100-2 at 14, ¶ 15 (alteration in original).  Frawley did not consult with any other practitioners prior to preparing or filing the application, and he hired someone from the Internet to prepare the drawings for the application.  Frawley attempted to file the first application on April 20, 2017, by registering as a guest user on the USPTO Electronic Filing System.  After doing so, Frawley did not take any steps to follow-up on the status of the application.  The USPTO subsequently sent two notices addressed to Frawley at his office, the first on April 21, 2017, the second on June 13, 2017, indicating that the application had not been given a filing date because it was incomplete.  On August 18, 2017, the USPTO sent a third notice to Frawley, indicating that the proceedings for the application had been terminated.  Frawley testified that he never received any communication from the USPTO concerning the D206 application, and he specifically denied ever receiving the June 13th and August 18th notices.

In June and July of 2017, Frawley communicated with True and another Integrity employee about the possibility of filing a second patent application that would apply to a new step-clip technology design "for use by competitors" that would "block competitors from getting around the first patent [application]" that was filed. ECF No. 100-2 at 17, ¶¶ 33, 36.  On July 18, 2017, Frawley received an email from the Integrity employee, which he understood to be an instruction to begin preparing the second patent design application.  On August 8, 2017, Frawley sent an email to True confirming that he had filed two design patent applications.[4]  ECF No. 100-2 at 17, ¶ 39.  However, when Frawley represented to True that he had filed a second design patent application for the Competitor Step-Clip, he had not filed that application.  In May of 2018, Frawley again represented to Integrity that he had filed two design patent applications the previous year, one in April and one in June.  He also told True that the DuraLife Step-Clip design patent application had a one-year shelf life, even though he did not believe or know that that was true.

In early 2018, Frawley learned that True was considering selling some of Integrity Composites' assets.  At Integrity's request, Frawley prepared an Intellectual Property Agreement Schedule, an Asset Purchase Agreement, and a Purchase Price Allocation Agreement.  Frawley was also responsible for communicating with

---

[4] Eaton Peabody qualifies this statement, noting that the Court should refer to the cited document for its full context.  I conclude that Integrity's record citations support an inference that Frawley represented that he had filed two design applications.  Frawley wrote in an email that he had included designs for the Competitor Step-Clip in the "last design patent application," which indicates that there was more than one application, and he listed the filing dates of the DuraLife Step-Clip application and the Competitor Step-Clip application as May 2017 and June 2017, respectively.  ECF No. 94-5 at 264. Accordingly, I treat Integrity's statement as admitted.  *See* D. Me. Loc. R. 56(f).

Barrette's counsel, Attorney Deborah McGowan, about intellectual-property-related matters during the negotiations.[5]

## B.    Negotiations Between Barrette and Integrity

In the fall of 2017, Barrette learned from a private capital investment firm, NextGen Capital, that Integrity Composites was open to being acquired.  By early April 2018, desAutels and True were involved in negotiations regarding Barrette's potential acquisition of Integrity Composites.[6]  In May 2018, Barrette sent a Letter of Intent to Integrity indicating that it was interested in purchasing "all or substantially all" of Integrity Composites' assets.  ECF No. 101-1 at 11, ¶ 9.  The Letter of Intent provided that Barrette would acquire all of Integrity Composites' intellectual property, including the design patent application for the DuraLife Step-Clip, but it did not reference a second pending patent application for the Competitor Step-Clip.

Originally, of the two patent applications, Barrette only intended to purchase the DuraLife application, but in June 2018, Integrity offered to add the Competitor Step-Clip application to the deal. Because the parties were considering including the Competitor Step-Clip application in the sale, on June 14, 2018, True requested that Frawley revise the Intellectual Property Assignment Agreement to include the Competitor Step-Clip application.

---

[5]  Integrity refers to Attorney "McGovern," however, I refer to her as Attorney McGowan based on other filings in the case.

[6]  Barrette and Eaton Peabody dispute whether representations were made as to the purported value of the two step-clip patent applications compared to the overall value of the DuraLife brand.  Because this dispute is not material to the ultimate question of whether Barrette can meet its burden of proof on damages, I do not address it further.

Also on June 14, 2018, Attorney McGowan requested copies of the DuraLife Step-Clip application and the filing number for the Competitor Step-Clip patent application. At this time, Frawley realized that he had never filed the Competitor Step-Clip application in 2017. However, Frawley did not inform True or Barrette of his failure to file the second application, but he instead immediately filed an incomplete application on June 15, 2018, (the "D482 application"). He did not check on the status of the second patent application after filing it. When True confirmed to Frawley on June 18, 2018, that the Competitor Step-Clip application would be included in the sale, Frawley revised the Intellectual Property Assignment Schedule to include both patent applications and listed their filing dates as April 20, 2017, and June 15, 2017—even though the first application had not been filed successfully and the actual filing date of the second application was June 15, 2018.[7]

When the Competitor Step-Clip application was added to the deal, the parties added $200,000 to the purchase price, although they dispute whether this amount represented the value of the Competitor Step-Clip application or whether it was intended to cover Integrity's working capital shortfall. I address this dispute further below. *See infra*, p. 24.

On June 29, 2018, the Asset Purchase Agreement between Barrette and Integrity, brokered by NextGen Capital and its managing director, was finalized. The

---

[7] Eaton Peabody denies Integrity's Statement of Material Fact 62, which relates to Frawley's revision of the Intellectual Property Assignment, for lack of record support. However, Eaton Peabody admits Integrity's Statement of Material Fact 63, which provides that Frawley listed the filing date of the Competitor Clip application as June 15, 2017, and that the actual filing date was June 15, 2018. Statement 62 is therefore deemed admitted because Eaton Peabody failed to properly controvert it. *See* D. Me. Loc. R. 56(f).

final Purchase Price Allocation Schedule included the sale of both patent applications; although the final schedule did not include a specific line item for these assets, there was a line item entitled "Goodwill" in the amount of $3.623 million.  The Asset Purchase Agreement "warranted that there had been 'no abandonment or lapse of or failure to maintain in full force and effect any Intellectual Property Registration.'"  ECF No. 101-1 at 15, ¶ 39 (quoting ECF No. 101-5 at 51).  Barrette paid approximately $10.8 million.

## C.   **Barrette's Attempts to Obtain Copies of the Patent Applications**

After the purchase agreement had been signed, and throughout the remainder of 2018 and during 2019, Barrette and its counsel, Attorney McGowan, repeatedly asked Frawley for copies of the two patent applications, screenshots from the Patent Application Information Retrieval system, and the USPTO prosecution history.  Frawley either did not respond to these requests or he excused his delayed responses by falsely stating that he was "'responding to an inquiry from the patent office' and that he would 'send [the applications] once they are in order,'" but otherwise did not provide Barrette with the requested information.[8]  ECF No. 100-2 at 22, ¶ 72 (quoting ECF No. 94-5 at 37-38, Tr:148:15-149:5).  After repeated requests, the only documents that Frawley provided to Barrette were the patent application receipts from the USPTO website, which he sent on November 2, 2018.  He never attempted to check

---

[8]  Eaton Peabody qualifies this statement, claiming that the record citation does not support the fact that Frawley "falsely claim[ed]" this.  ECF No. 108-1 at 15, ¶ 64.  Viewed in the light most favorable to Integrity, Frawley asserted that he was awaiting correspondence from the USPTO when in fact he had not made any attempts to follow-up on the applications and was not communicating with the USPTO.  This reasonably constitutes a "false claim" or excuse, and Integrity's statement is deemed admitted.

the status of either application on the USPTO website or the Patent Application Information Retrieval system.

Barrette learned in June 2019 that both applications had been terminated. It was discovered that Frawley had filed a "partially completed application package for the D206" patent around April 2017 and a "partially completed application package for the D482" patent around June 2018. ECF No. 101-1 at 2, ¶¶ 4-5. The USPTO did not issue filing dates for either application because they were incomplete, and "were missing the specification, a claim, the statutory basic filing fee, the application search fee, the application examination fee, and a properly executed inventor's oath or declaration."[9] ECF No. 100-2 at 3, ¶ 7. Both applications were "terminated as abandoned" on August 18, 2017, and September 20, 2018, respectively. ECF No. 100-2 at 4, ¶¶ 8-9.

Barrette hired patent prosecution Attorney John Maldjian who attempted to revive the terminated patent applications, but his attempts were ultimately unsuccessful. Maldjian subsequently filed several design and utility patent applications with the USPTO on Barrette's behalf, and between 2019 and the present, three have matured into utility patents.

---

[9] Barrette and Eaton Peabody dispute how likely it was that the patent applications would have been approved but-for Frawley's conduct. Eaton Peabody asserts that "[i]t is uncertain that, had the [applications] been filed correctly by Frawley, they would have ultimately issued into U.S. Patents." ECF No. 95-2 at 3, ¶ 11. Barrette in turn argues that Maldjian's testimony reflected "only that the chances of a patent application being granted are never '100 percent,' which does not equate with saying their ultimate issuance was 'uncertain.'" ECF No. 101-1 at 4, ¶ 11. Viewed in the light most favorable to Barrette, I treat as admitted that the chances of a patent application being approved are never 100% guaranteed.

Neither Barrette nor Integrity have designated an expert witness to testify in this litigation as to the purported value of the two terminated patent applications. Although Barrette designated Maldjian as an expert witness, he was designated to testify regarding patent issues, rather than the specific value of the D206 and D482 applications.

## II.    LEGAL ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue is 'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)); *United States v. P.R. Indus. Dev. Co.*, 18 F.4th 370, 377 (1st Cir. 2021) ("A fact is material if 'it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets.'" (quoting *Finamore v. Miglionico*, 15 F.4th 52, 58 (1st Cir. 2021))).

To prevail, the moving party "must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (alteration in original) (quoting *Carmona v. Toledo*, 215

F.3d 124, 132 (1st Cir. 2000)).  The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in their favor when determining whether summary judgment should be granted.  *Taite v. Bridgewater State Univ., Bd. of Trs.,* 999 F.3d 86, 92 (1st Cir. 2021).

## B.    Summary Judgment as to Barrette's Complaint

### 1.    The Parties' Arguments

Eaton Peabody concedes that (1) "Frawley did not exercise appropriate skill, prudence, and diligence" in prosecuting the patent applications; (2) Frawley negligently misrepresented the status of the patent applications; (3) Eaton Peabody is vicariously liable for Frawley's acts and omissions; and (4) Eaton Peabody and Frawley breached their fiduciary duties.[10]  ECF No. 95-2 at 4, ¶ 17.  However, Eaton Peabody argues that summary judgment should be granted in its favor on all of Barrette's claims because Barrette cannot sustain its burden of proof on damages.  It contends that (1) Barrette's evidence of the value of the two patent applications is speculative, and an expert witness has not been designated to testify to their value; and (2) Barrette has not demonstrated evidence of lost sales or reputation damages

---

[10]  Integrity qualifies these statements on the grounds that they set forth legal propositions and should be stricken.  Although legal conclusions in statements of material facts are not appropriate, Integrity's requests to strike do not comply with District of Maine Local Rule 56(c) and (f), which require an opposition to summary judgment to consist of short and concise statements properly supported by record citations.  Moreover, Integrity's requests are excessively argumentative.

resulting from the terminated patent applications. Eaton Peabody avers that a party seeking the benefit of its bargain under a breach-of-contract theory of damages must show the fair market value of the patent applications at the time the breach occurred, which Barrette has not done. Eaton Peabody also argues that Barrette successfully mitigated its alleged damages by hiring Maldjian and obtaining new patents, and that "Barrette cannot recover the benefit of its bargain if it has successfully made itself whole by acquiring new patents—such would effectively be double recovery." ECF No. 107 at 9 (quotations omitted).

Barrette counters that this is "a straightforward breach of contract case" because "[Integrity] sold to Barrette property it never received[,]" and Barrette alleges that it has put forth sufficient record support regarding damages to survive summary judgment. ECF No. 101 at 8. Barrette characterizes its estimate of damages in various ways, for example, arguing that it "has been deprived of the essential benefits of the [Asset Purchase Agreement], namely, the value of the Patent Applications it thought it was buying," ECF No. 1 at 8, ¶ 59, and that it "is not seeking lost profits, but rather the difference between what it paid for the assets of Integrity versus what it would have paid without the patent applications," ECF No. 101 at 2. Barrette seeks $1.2 million in damages, which desAutels estimates to be reasonable based on his professional knowledge of Barrette's prior dealings and acquisitions, and which Barrette characterizes as "the amount it overpaid for Integrity Composites compared to previous comparable acquisitions." ECF No. 101-1 at 7, ¶ 22. Barrette also alleges that it has incurred legal fees and costs while enforcing its

indemnification rights under the Asset Purchase Agreement, arguing that it "has been forced to expend additional financial resources to attempt to revive the failed applications and subsequently file new ones with the USPTO, which have since become issued patents."  ECF No. 101 at 16.

For the reasons set forth below, I conclude that Barrette cannot meet its burden of proof as to compensatory damages because (1) Barrette has not offered sufficient, non-speculative evidence of the value of the two terminated patent applications, and (2) even if Barrette's evidence of the applications' value was sufficient, Barrette successfully mitigated its damages and has not shown that it was unable to recover the purported value of the two applications and has not offered evidence of any other losses that it was unable to mitigate.  Accordingly, because Barrette cannot meet its burden of proof, Eaton Peabody is entitled to summary judgment on the issue of compensatory damages.  Eaton Peabody is also entitled to summary judgment on the issue of consequential damages arising from any lost profits or reputation damage.  However, because Barrette has produced competent evidence of its mitigation expenses, Eaton Peabody is not entitled to summary judgment on the issue of consequential damages that Barrette incurred as a result of its mitigation efforts.

### 2.    **Barrette's Evidence of Damages**

To survive summary judgment, a non-moving party must produce prima facie evidence for each element of its claim.  *Packgen v. Berry Plastics Corp.,* 113 F. Supp. 3d 371, 389 (D. Me. 2015) ("[T]he plain language of Rule 56(c) mandates the entry of

judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." (alterations in original) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986))).  Accordingly, Barrette must raise a triable issue of fact as to damages, an essential element of each of its claims against Integrity.  *See Tobin v. Barter*, 2014 ME 51 ¶ 10, 89 A.3d 1088 (damages as an element of a breach of contract claim); *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (damages as an element of a negligent misrepresentation claim); *see Cianchette v. Cianchette*, 2019 ME 87, ¶¶ 20, 23, 209 A.3d 745 (damages as an element of a fraudulent misrepresentation claim).

"[B]reach of contract damages, as a general proposition, should be based on the injured party's 'expectation interest,' defined as its 'interest in having the benefit of [its] bargain by being put in as good a position as [it] would have been in had the contract been performed . . . .'" *Deering Ice Cream Corp. v. Colombo, Inc.*, 598 A.2d 454, 456-57 (Me. 1991) (second, third, and fourth alterations in original) (quoting Restatement (Second) of Conts. § 344 (Am. L. Inst. 1981)); *see McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 54 (Me. 1996) ("The overriding purpose of an award of compensatory damages for a breach of contract is to place the nonbreaching party in as good a position as she would have been in had there been no breach.").  "The measure of damages in tort for misrepresentation . . . is the same as the measure of damages for breach of contract." *Tetra Tech Constr. Inc. v. Summit Nat. Gas of Me. Inc.,* No. 1:14-cv-00298-GZS, 2016 WL 3881056, at *2 (D. Me. July 13, 2016), *report and recommendation adopted,* No. 1:14-CV-00298-GZS, 2016 WL 4133503, at *1 (D.

Me. Aug. 3, 2016); *see, e.g.*, *Veilleux v. Nat'l Broad. Co.,* 206 F.3d 92, 123-24 (1st Cir. 2000) ("Under Maine law, the proper measure of damages for a misrepresentation claim is plaintiff's lost bargain." (citing *Wildes v. Pens Unlimited Co.,* 389 A.2d 837, 841 (Me. 1978))).

A party's estimate of damages "must not be uncertain or speculative but must be grounded on facts in evidence." *King v. King,* 507 A.2d 1057, 1059 (Me. 1986). "A monetary award based on a judgmental approximation is proper, provided the evidence establishes facts from which the amount of damages may be determined to a probability." *Merrill Tr. Co. v. State,* 417 A.2d 435, 440–41 (Me. 1980). Thus, to recover damages it suffered as a result of Integrity's alleged breach of contract and misrepresentations, Barrette must offer sufficient evidence, grounded in facts in the record, that would allow a factfinder to calculate those damages with "reasonable certainty." *Id.* However, Barrette can only recover its lost bargain and other pecuniary damages if it took reasonable steps to mitigate its damages and offers sufficient evidence of losses that it was unable to avoid. *See In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 2010 ME 93, ¶ 12, 4 A.3d 492.

### (a) Motion in Limine

As a preliminary matter, I first address Eaton Peabody's Motion in Limine (ECF No. 79) which seeks to exclude desAutels's opinion testimony concerning Barrette's alleged damages, "particularly any opinion [d]esAutels may give on the value of any patent application at issue in this case." ECF No. 79 at 1. Eaton Peabody argues that only expert testimony is admissible to establish the value of intellectual

property—including patent applications—and contends that desAutels cannot provide lay opinions as to his belief about the patent applications' values.  Eaton Peabody argues that even as a lay witness testifying pursuant to Fed. R. Evid. 701, desAutels may not testify "to the value of unissued patent applications, or other intangible or uncertain assets," ECF No. 109 at 5, and that his opinion would impermissibly be based on "his status as the alleged owner of the intellectual property at issue, as well as his personal experience in negotiating the acquisition of Integrity assets." ECF No. 79 at 5.  Eaton Peabody avers that even if desAutels's lay opinion could be offered, his testimony on the patents' value would be "at best conclusory; at worst rank speculation." ECF No. 79 at 6.

Barrette concedes that desAutels is not an expert witness but argues that he intends to offer lay opinion testimony under Fed. R. Evid. 701 (ECF No. 102).  Barrette asserts that desAutels's testimony "is a classic example of 'lay expertise a witness personally acquires through experience, often on the job,' which is rationally based on his particularized knowledge relating to his position in the business."  ECF No. 102 at 8 (citing Fed. R. Evid. 701 advisory committee's note to 2000 amendment).  Barrette argues that "the owner or officer of a business may testify as to the value or profits of a business" and that a jury would be able to draw reasonable conclusions from his testimony without speculating.  ECF No. 102 at 6.  Barrette also contends that beyond the value of the patent applications, desAutels's anticipated testimony relates to Barrette's damages that include legal fees for (1) "corrective patent work"

and (2) enforcing Integrity's intellectual property warranty under the Asset Purchase Agreement.  ECF No. 102 at 4.

Federal Rule of Evidence 701 permits a witness to testify to his or her opinion to the extent it is "rationally based on the witness's perception," "helpful to clearly understanding [their] testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See Swajian v. Gen. Motors Corp.*, 916 F.2d 31, 36 (1st Cir. 1990) ("For opinion testimony of a layman to be admissible[,] three elements must be present.  First, the witness must have personal knowledge of the facts from which the opinion is to be derived.  Second, there must be a rational connection between the opinion and the facts upon which it is based.  Third, the opinion must be helpful in understanding the testimony or determining a fact in issue.").

As a principal participant in the transaction, desAutels may testify to relevant, admissible facts regarding the transaction based on his personal knowledge.  As the President of Barrette, desAutels also has personal knowledge of Barrette's prior business acquisitions and Barrette's sales projections for the DuraLife products, which may, of course, provide a basis for lay opinion testimony.  *Nat'l Starch & Chem. Trading Co. v. M/V STAR INVENTANA*, No. 05-91-P-S, 2006 WL 1876996, at \*3 (D. Me. July 5, 2006) ("A witness may testify under Rule 701 about 'inferences that he could draw from his perception' of a business's records, or 'facts or data perceived' by him in his corporate capacity." (quoting *Teen–Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403-04 (3d Cir. 1980))).  The extent to which he may offer opinions or inferences

as to the value of the patent applications based on this personal knowledge depends on whether the opinions are rationally based on his perceptions. Fed. R. Evid. 701; *Downeast Ventures, Ltd. v. Washington Cnty.,* 450 F. Supp. 2d 106, 109 (D. Me. 2006) ("Under the Federal Rules of Evidence, the primary limitation on the valuation testimony of a corporate employee is foundational; Rule 701 permits a witness to testify to his opinion to the extent it is 'rationally based' on his perceptions . . . ." (quoting Fed. R. Evid. 701)).

Barrette contends that "desAutels's years of experience and close involvement with the acquisition of Integrity's assets, as well as other acquisitions, qualifies him to testify as to why Barrette paid $10.8 million dollars for Integrity's assets in this case." ECF No. 102 at 8. But Barrette otherwise fails to provide any concrete information regarding the basis for desAutels's opinion. Although desAutels testified at his deposition that he believed $1.2 million dollars was a "fair offer" for the two pending patent applications, ECF No. 94-4 at 139:6, and mentioned several earlier transactions he had participated in, he otherwise offered no details regarding those transactions, such as the extent to which they involved the valuation of intellectual property or, more specifically, the valuation of patent applications.[11] Barrette's

---

[11] DesAutels testified as follows regarding the other acquisitions he relied on to arrive at a combined value of $1.2 million for the two patent applications:

> Q:   What comparable acquisitions are you referring to?
> A:   I would compare this acquisition to Alumi-Guard, as an example. And, again, just to specify, the $1.2 million, I thought it was a fair offer; but I would say we would have paid a lot less than this in our previous acquisition.
> Q:   Other than Almi-Guard, any other particular acquisition that you were using as a benchmark with . . .to measure against the Integrity purchase?
> A:   It would be Satellite Manufacturing, most of our acquisition, I would say.
> Q:   Satellite Manufacturing, that's the name of the company that you acquired?

statements of material fact are even less specific as to the facts upon which desAutels's valuation was based, stating only that "[t]he value of the intellectual property being sold by [Integrity] to Barrette was included in the amount allocated to "Goodwill" in the Purchase Price Allocation Schedule."  ECF No. 101-1 at 15, ¶ 38.

Accordingly, there is little meaningful information offered by Barrette from which to conclude that desAutels's lay opinion of the value of the DuraLife Step-Clip patent application is rationally based on his perception of facts known to him. Instead, his opinion appears to be based on nothing more than his general experience in having participated in Barrette's prior acquisition of other unrelated businesses that may or may not have included intellectual property.  Without having provided any specific information about those prior transactions, Barrette cannot show that desAutels's opinion regarding the value of the Duralife Step-Clip application has any basis in fact.   DesAutels also testified that he did not receive any professional or

---

A:    Yes, to name a few.
Q:    Any other acquisitions that you have in mind as being the specific benchmark
      that you were measuring the Integrity purchase against to come up with that
      number?
A:    We . . . were starting to negotiate with MVP in the same timeline as well, but
      I don't think it was close, either; but we were negotiating in the same timeline.
Q:    Can you tell me what the purchase price was in Alumi-Guard?
A:    Alumi-Guard was . . . it's been a while, but in $20-, $20-, $23 million, something
      like this with an earnout.
Q:    How about Satellite Manufacturing?
A:    Very small, $1 million.
Q:    And MVP?
A:    Twenty.
Q:    What was . . . the product line that Alumi-Guard was involved with?
A:    Aluminum fence and rail.
Q:    And Satellite Manufacturing?
A:    Aluminum fence.
Q:    And MVP?
A:    Vinyl fence and vinyl rail.

ECF No. 94-4 at 139:1-140:16.

informal analysis of the patent applications and their values. In addition, the Goodwill line item in the Asset Purchase Agreement does not itself provide a foundation for the $1 million estimate because the line item—totaling $3.623 million—offers no indication as to what assets were included in the total amount or the value assigned to each asset.

Although the summary judgment record contains almost no information as to facts forming the basis for desAutels's lay opinion regarding the value of the Duralife Step-Clip patent application, his lay opinion as to the value of the Competitor Step-Clip application is supported. Specifically, desAutels testified that he and True had assigned a value of $200,000 to the Competitor Step-Clip application through their negotiations. Although Eaton Peabody disputes this, arguing that the $200,000 was understood by the parties to be the amount of a working capital shortfall, that disputed fact does not detract from desAutels's opinion and, therefore, Barrette's assertion that the figure was an agreed-to value for the Competitor Step-Clip application arrived at during an arms-length negotiation.

Accordingly, Eaton Peabody's Motion in Limine is granted in part as to desAutels's opinion testimony about the $1 million valuation of the DuraLife patent application. The motion is denied in part as to desAutels's opinion regarding the Competitor Step-Clip patent application.

### (b) Barrette's Estimates of the Value of the Patent Applications

I now turn to Barrette's remaining evidence of compensatory damages. Barrette offers various estimates—most of which are based on desAutels's

testimony—of the values of the two patent applications at the time of the negotiations.  As I explain below, most of these estimates are not "grounded on facts in evidence," *Tang of the Sea, Inc. v. Bayley's Quality Seafoods, Inc.*, 1998 ME 264, ¶ 8, 721 A.2d 648 (quoting *Williams v. Ubaldo*, 670 A.2d 913, 917 (Me. 1996)), and would not permit a jury to calculate damages to a reasonable certainty without speculation and conjecture.

First, Barrette points to the Goodwill line item in the agreement—which totaled $3.623 million—and argues that this amount reflected, among other things, the value of the intellectual property assets, including the patent applications.  Eaton Peabody denies this, arguing that witness Michael E. High, an attorney, testified that "goodwill is in there at a certain number.  And usually the IP would be part of the goodwill[,]" but he also confirmed "that the 'goodwill component' in the Asset Purchase Agreement [in this case] does not specifically list patent applications or issued patents."  ECF No. 107-1 at 11-12, ¶ 38 (quoting ECF No. 101-5 at 11, Tr: 38:4-18).  Eaton Peabody also argues that although "Mr. desAutel testified that goodwill could include things like a 'patent,'" the plain terms of the Asset Purchase Agreement "did not contemplate patents or patent applications being valued as or considered as 'goodwill.'"  ECF No. 107-1 at 11-12, ¶ 38.  The preceding evidence, viewed in the light most favorable to Barrette, would not permit a factfinder to calculate, without speculation or conjecture, the percentage or portion of the $3.623 million line item that represented the value of the two patent applications.

Second, Barrette argues that both Barrette and Integrity believed that the total purchase price, $10.8 million, included the two patent applications. Barrette alleges that the value of these patent applications—specifically the DuraLife Step-Clip application—was a primary motivating factor in its decision to pursue Integrity Composites' assets and agree to the purchase price. Barrette alleges that "[i]f [Integrity] had not represented that . . . [they] had a patent pending on the DuraLife Step-Clip, Barrette would not have pursued the acquisition," and that "[a] portion of what Barrette paid for the assets of Integrity Composites was based on the purported existence" of the two pending patent applications.[12] ECF No. 101-1 at 14, ¶¶ 32, 34. Barrette's and Integrity's recognition that an unspecified portion of the total purchase price—over $10 million—represented the value of the two patent applications, and desAutels's belief that the patent applications held substantial value, do not constitute reasonably specific estimations of Barrette's damages. Nor is desAutels's opinion about what motivated Barrette to pay $10.8 million for all of Integrity's assets helpful to determining the specific value of the patent applications at the time of the sale.

Barrette's most specific estimate of damages is $1.2 million, which it calculated based on (1) the $1 million amount, which was desAutels's "conservative" estimate of

---

[12] Eaton Peabody disputes this statement for lack of record support and argues that desAutels was more interested in the DuraLife brand than the pending patent application. The record reflects that desAutels expressed interest in the Step-Clip products and technology more broadly, including the DuraLife product that was patent-pending. He stated that DuraLife was "what really attracted my attention to the company. I would say without this, I don't think I would have showed up at that location." ECF No. 94-4 at 50:4-21. Viewing the evidence in the light most favorable to Barrette, I deem it admitted that desAutels was largely motivated to pursue the acquisition of Integrity Composites' assets based on the DuraLife brand and step-clip application that would "give[] Duralife an edge on other competitors." ECF No. 94-4 at 50:19-20.

23

the value of the DuraLife Step-Clip patent application, ECF No. 101 at 13, and (2) the $200,000 amount, which Barrette argues represents the consideration it paid in exchange for adding the Competitor Step-Clip patent application to the transaction. At the very least, Barrette argues, $200,000 represents sufficiently specific evidence of the value of the Competitor Step-Clip application.  Because I concluded that desAutels's opinion as to the value of the DuraLife Step-Clip application is an inadmissible lay opinion, I address only the $200,000 valuation of the Competitor Step-Clip application.

Barrette and Eaton Peabody dispute the significance of this amount.  While Barrette contends that Integrity "offered to add the Competitor Step-Clip patent application into the deal for an additional $200,000 in consideration," ECF No. 101-1 at 11, ¶ 11, Eaton Peabody argues that this part of the deal was "negotiated . . . to address the shortfall in Integrity's working capital calculation that included transfer of the Competitor Clip patent application."  ECF No. 107-1 at 5, ¶ 11.  Viewed in the light most favorable to Barrette, the $200,000 value is competent and specific evidence of the application's actual value, which would permit a jury to calculate with reasonable certainty Barrette's damages.  However, Barrette cannot recover losses— including the value of the Competitor-Step Clip patent application—that it has successfully mitigated.  Although the $200,000 may represent the value of the Competitor Step-Clip application, Barrette has not proffered evidence of the value of the replacement patent applications—and ultimately issued patents—that it obtained through its mitigation efforts.  Thus, there is no basis to compare the

claimed $200,000 value of the Competitor Step-Clip application with the values of the replacement applications, and to determine with reasonable certainty whether Barrette effectively recovered the value of the benefit of its bargain. Accordingly, this estimation of the value of the Competitor Step-Clip application, without more, is insufficient proof of damages.

As to evidence of other damages, for reasons I will address, Barrette has not offered proof of any damages that it was unable to mitigate, beyond the fees, costs, and expenses it incurred in mitigating its damages.

### (c) Consequential Damages

"[A] plaintiff has a duty to use reasonable efforts to mitigate his or her damages." *Lindsey v. Mitchell*, 544 A.2d 1298, 1301 (Me. 1988). "The doctrine of mitigation of damages, or avoidable consequences, encourages plaintiffs to take reasonable steps to minimize losses caused by a defendant's negligence by prohibiting recovery for any damages that the plaintiff could reasonably have avoided." *In re Hannaford Bros.*, 2010 ME 93, ¶ 12, 4 A.3d 492. However, "[a] corollary of the mitigation doctrine permits the plaintiff to recover for costs and harms incurred during a reasonable effort to mitigate." *Id.*

Barrette successfully mitigated its damages by hiring Maldjian to revive the terminated patent applications filed by Frawley, and to subsequently prepare and file similar or substantially similar patent applications. As a result of Barrette's efforts, new patents applications—and ultimately patents—were obtained, and, as desAutels

testified at his deposition, the products covered by these new patents are now being produced by Barrette and sold to its customers.

Barrette and Eaton Peabody dispute two aspects of these mitigation efforts.[13] First, they dispute the extent to which the designs of the D206 and D428 applications differed from the subsequent patent applications that Barrette applied for and ultimately obtained.  Second, they dispute whether Barrette "sells products that are substantially similar to the products that would have been covered by the [two] applications (had they issued)," and whether the products are sold to the same customers.  ECF No. 95-2 at 3, ¶¶ 13, 14.

Despite these disputes, however, Barrette has not shown actual losses resulting from any purported difference in the patent applications or the covered products.  Specifically, whether the subsequent patent applications were subtly or substantially different in design, Barrette has not provided a reasonable estimate of the difference between the purported value of the original patent applications, and the value of the replacement patent applications obtained by Maldjian.  Barrette argues that because Maldjian's patent applications were ultimately issued by the USPTO, "this points to the conclusion that the Patent Applications that were allegedly sold to Barrette could and would have received USPTO approval and were patentable."  ECF No. 101 at 16.  This misses the mark.  If in fact the applications

---

[13]  Integrity moved to strike Eaton Peabody's Statements of Material Fact 11, 12, and 13 on the grounds that the statements constitute "opinion[s] of an expert, not a material fact."  ECF No. 100-2 at 4.  Local Rule 56(e) does not allow for "motions to strike" in an opposition to summary judgment.  Rather, a party must include as part of its response that the statement of fact "should be stricken."  D. Me. Loc. R. 56(e).  The party must also admit, deny, or qualify the statement.  D. Me. Loc. R. 56(e).  Accordingly, in keeping with the Local Rule, I do not consider Integrity's requests.

were virtually equivalent to the patents that ultimately issued, then the patents obtained through mitigation efforts—and the products covered by those patents—have fully restored Barrette to the position it would have been in but-for the alleged breach of contract and misrepresentations.  Likewise, even if the customer base for the products protected by the replacement patents differs from the customer base that Barrette expected to attract with the original applications, there is no indication that Barrette has suffered any losses as a result of this difference.  Furthermore, Barrette has not offered any evidence that the delay in obtaining replacement patent applications caused it to incur any losses.  Thus, the question becomes whether Barrette has suffered any additional consequential damages, including its mitigation expenses..

Barrette alleges that it "has incurred various forms of consequential damages, including, but not limited to, the professional and other costs it has incurred in attempting to salvage patent protection for the Step-Clip technology."  ECF No. 102-1 at 6.  Eaton Peabody concedes this, stating that "to the extent there is any question of fact remaining on the issue of Barrette's damages, it remains only as to what Barrette has paid in total to acquire the new patents."[14]  ECF No. 107 at 9.  However,

---

[14] Barrette alleges that it "has incurred legal fees to its litigation counsel in the present action, which are still ongoing, in order to enforce its indemnification rights under the [Asset Purchase Agreement] arising out of the invalidity of the D206 and D482 Applications."  ECF No. 101-1 at 15, ¶ 41.  Eaton Peabody denies this, stating that "Barrette has incurred legal fees for more than simply 'enforcing its[] indemnification rights under the [Asset Purchase Agreement] . . . .'.  Barrette has brought claims in tort, including intentional and negligent misrepresentations made by [Integrity], as well."  ECF No. 107-1 at 12 (second alteration in original).  Viewed in the light most favorable to Barrette, I treat as admitted that Barrette's legal fees incurred in the present action arise, in part, from its efforts to enforce its indemnification rights.  To the extent that these fees constitute consequential damages, I address them further below, *see infra*, p. 31.

Eaton Peabody contends that Barrette has not shown evidence of lost sales or damage to its reputation, while Barrette argues that desAutels's deposition testimony constitutes proof of damages regarding "a decline in . . . sales of DuraLife products in 2019 versus projections" and damage to Barrette's reputation.  ECF No. 101-1 at 4-5. I first address Barrette's evidence of lost sales and damage to its reputation, and then turn to Barrette's evidence of mitigation expenses.

### (i)  Evidence of Lost Sales and Reputation Damage

A party may be entitled to recover consequential damages in the form of lost sales, future income, or damage to its reputation arising from a breach of contract or tortious conduct.  *See, e.g., Marquis v. Farm Fam. Mut. Ins. Co.*, 628 A.2d 644, 650 (Me. 1993) ("Damages for loss of '[p]rospective profits are allowable only if they can be estimated with reasonable certainty.'" (quoting *Ginn v. Penobscot Co.*, 334 A.2d 874, 887 (Me. 1975))).  To recover such damages, the party "must establish: (1) [t]he amount of [his or her] damages to a reasonable, as distinguished from a mathematical, certainty, and (2) [t]hat the damages for which [he or she] seeks compensation were reasonably within the contemplation of the contracting parties when the agreement was made."  *Forbes v. Wells Beach Casino, Inc.*, 409 A.2d 646, 654-55 (Me. 1979) (internal citation omitted) (citing *McDougal v. Hunt*, 146 Me. 10, 14, 76 A.2d 857, 860 (1950)); *Snow v. Villacci,* 2000 ME 127, ¶ 13, 754 A.2d 360 ("When the evidence offered to show prospective damages is in the nature of 'mere guesswork and conjecture,' the factfinder will be unable to determine the plaintiff's loss 'with reasonable certainty.'"  (quoting *Ginn*, 334 A.2d at 887)).  For reasons I will

explain, there is insufficient evidence in the record to permit a reasonable factfinder to conclude that Barrette suffered lost sales or reputational damage as a result of the alleged breach of contract and misrepresentations.

DesAutels testified, without providing details, that the actual sales of the DuraLife product in "2019 was a disaster compared to projections." ECF No. 94-4 at 131:13-14.   He confirmed that the sales projections for DuraLife products over a three-year period, including 2019—projected in the range of $17 million—was ultimately accurate, but he stated that "the business was very different.  We had to revive something to get to that number." ECF No. 94-4 at 131:25, 132:1.  He explained that the successful sales of DuraLife in 2020 resulted from the replacement patent applications and sales to a new customer, Home Depot, and had "nothing to do with what we bought" from Integrity.  ECF No. 94-4 at 132:3-7.  Apart from this deposition testimony, Barrette has not offered any evidence that explains the degree to which the company suffered lost sales or profits attributable to the conduct of Integrity or Eaton Peabody.  The fact that the sales of DuraLife products in 2019 did not meet expectations does not itself establish a causal link between the terminated patent applications and pecuniary damages to Barrette, nor does it provide an estimate of any losses with reasonable certainty.  Accordingly, because a jury would be unable to calculate with reasonable certainty Barrette's damages arising from lost sales, and there is no other evidence in the record for these losses, Barrette cannot meet its burden of proof.

Eaton Peabody also argues that Barrette has not identified any damage to its business reputation as a result of the terminated patent applications.  ECF No. 95-2 at 3, ¶ 16.  Barrette disputes this and argues that Eaton Peabody relies on a record citation that "refers only to one customer (Lowe's), and Mr. desAutels disagreed with the proposition that Barrette's reputation had not been affected."  ECF No. 101-1 at 5.  Barrette's argument is unpersuasive.  DesAutels did not confirm that Barrette's reputation had been harmed because of the "nonexistent patent applications," but stated only that economic harm resulting from the harm to its reputation "doesn't show, but times will tell."  ECF No 94-4 at 122:3, 16.  When asked whether Barrette lost its deal with Lowe's as a result of a misrepresentation about the nonexistent patent applications, desAutels stated: "We were never told that it was a misrepresentation about a patent application, but we lost the business and we didn't win the decking business.  We were told this was a branding decision. . . . I don't think we didn't win the [decking] business because of the patent pending misrepresentation."  ECF No. 94-4 at 122:22-25, 123:1, 7-9.  DesAutels also testified that he did not believe that Barrette ever had to change its website advertising DuraLife products to remove reference to "patent pending" because they filed new patent applications "immediately at the same time."  ECF No. 94-4 at 123:19.  He further testified that he did not think that Barrette ever had to remove "patent pending" from its marketing materials.

Accordingly, Barrette has not offered sufficient evidence that would permit a jury to find that Integrity's conduct caused Barrette to suffer lost sales or reputational

damage, nor would a jury be able to calculate those damages with reasonable certainty. Because Barrette cannot meet its burden of proof, Eaton Peabody is entitled to summary judgment as to the issue of consequential damages arising from lost sales and damage to reputation.

### (ii) Evidence of Mitigation Expenses

Barrette also alleges that it has incurred fees, costs, and expenses—including hiring Maldjian—in its efforts to revive the patent applications and file new applications. Eaton Peabody alleges that Barrette "paid Maldjian approximately $46,860.54 for his work in trying to revive the D206 and D482 applications and in obtaining the [subsequent] patents." ECF No. 95-2 at 5, ¶ 27. Although Barrette admits that it paid Maldjian for his work to revive the two patent applications and obtain new patents, Barrette argues that Maldjian "testified that the [$46,860.54 in] fees included on [Deposition] Exhibit 11 did not include fees related to his efforts to revive the D206 and D482 applications or other relevant fees incurred since May 20, 2021."[15] ECF No. 101-1 at 8, ¶ 27. Drawing all reasonable inferences in Barrette's favor, it appears that Barrette paid Maldjian at least $46,860.54, and has also incurred additional fees and expenses related to reviving the original patent applications. Although the total amount paid cannot be determined from the

---

[15] At Maldjian's deposition, he was asked to look at an invoice to Barrette in the amount of $46,860.54. He confirmed that the total included costs, fees, and attorney' fees for patent applications filed by Barrette, but that it did not include fees incurred in the present litigation against Integrity. This total also does not appear to include fees and costs that Barrette paid to Maldjian when he was originally hired to revive the D206 and D482 patents.

summary judgment record, the amount is susceptible to being calculated based on invoices and other business records.

Accordingly, Eaton Peabody is entitled to summary judgment on Barrette's claims for compensatory damages arising from Integrity's alleged contractual breach and misrepresentations, and on the issue of consequential damages in the form of lost sales and damage to reputation.  However, summary judgment is denied on the issue of consequential damages in the form of mitigation expenses because Barrette has put forth reasonably certain and non-speculative evidence of fees, costs, and expenses it incurred while attempting to mitigate avoidable damages arising from Integrity's conduct, and a genuine dispute of material fact exists as to the amount and extent of those damages.

## C.   Summary Judgment as to Integrity's Third-Party Complaint

Eaton Peabody also seeks summary judgment on Integrity's Third-Party Complaint in which Integrity seeks indemnification from Eaton Peabody for any damages that may be awarded to Barrette.[16]  Integrity also claims that it is entitled to recover from Eaton Peabody (1) "full attorneys' fees and costs in defending Barrette's action as a matter of law," ECF No. 100-1 at 17; (2) all attorney fees and costs incurred as a result of Eaton Peabody's tortious conduct—in particular, the fees incurred in bringing the breach of fiduciary duty claim against Eaton Peabody; (3) "[attorney] fees and costs associated in prosecuting the claims against the Third Party

---

[16]   Because Integrity has not filed a cross-motion for summary judgment on the issues of indemnification and liability, I do not grant relief in connection with Eaton Peabody's concession of liability on Counts I-V of Integrity's Third-Party Complaint.

Defendants [which] are . . . consequential damages incurred and are fully recoverable[,]" ECF No. 100-1 at 20, and (4) attorney fees and costs under the bad faith litigation conduct exception to the American Rule, including attorney fees arising from its opposition to Eaton Peabody's Motion for Summary Judgment.[17] Integrity also alleges that it is entitled to punitive damages because of Frawley's conduct.

I first address Integrity's claims for attorney fees incurred from defending itself against Barrette's action and Integrity's claims for attorney fees incurred from prosecuting its breach of fiduciary duty claim, and then turn to the remaining claims for attorney fees and punitive damages.

### 1. Attorney Fees Incurred in Defending Against Barrette's Action

Integrity seeks to recover the fees it incurred in defending itself against Barrette's claims under the "collateral litigation exception" to the American Rule. That exception permits a plaintiff to "recover fees expended in collateral litigation with a third party as a result of the defendant's wrongdoing." ECF No. 100-1 at 18. Eaton Peabody does not dispute that it is liable for reasonable attorney fees arising from Integrity's defense of Barrette's claims, noting that: "To the extent . . . [Integrity] can prove fees reasonably expended in the defense of claims caused by [Eaton Peabody and Frawley's] actions . . . such fees are likely recoverable." ECF No. 95-1 at 13.

---

[17] Because the parties focused their briefing on the recovery of attorney fees and did not meaningfully address the basis for recovery of costs, I limit my analysis to recoverable attorney fees and do not address the extent to which Integrity may be statutorily entitled to recover costs under federal or Maine law.

In support of its claim for attorney fees under this exception, Integrity cites to *Gagnon v. Turgeon*, 271 A.2d 634, 635 (Me. 1970).  In *Gagnon,* the Law Court held that "[w]here the wrongful act of a defendant has involved the plaintiff in litigation with others, or placed him in such relation to others as makes it necessary for him to incur expense to protect his interests, such costs and expenses, including attorney fees, must be treated as the legal consequence of a wrongful action and may be recovered as damages."  271 A.2d at 635.  Although the Law Court recognized this limited exception to the general rule that a prevailing party is responsible for its own fees and expenses, the decision did not address or implicitly recognize the "collateral litigation exception" to the American Rule.  *See id*.  Subsequent Law Court decisions have also made clear that "Maine has not recognized the collateral litigation exception to the American rule."[18]  *Soley v. Karll*, 2004 ME 89, ¶ 11 n.3, 853 A.2d 755.  While the collateral litigation exception has not been recognized, the general rule expressed in *Gagnon* applies to Integrity's claims for attorney fees incurred as a result of defending itself against Barrette's claims, and Eaton Peabody does not dispute that it is liable for these fees.

---

[18]  Integrity cites to *Maine v. CPM Constructors*, No. BCD-CV-14-44, 2014 Me. Bus. & Consumer LEXIS 13, at *10 (Aug. 11, 2014), which notes that "[t]he status of the collateral litigation exception in Maine is uncertain," citing to both *Soley v. Karll*, 2004 ME 89, ¶ 11 n.3, 853 A.2d 755, which held in 2004 that the exception has not been recognized in Maine, and to *Gagnon*, 271 A.2d 634, which was "an earlier decision [where] the Law Court espoused what appears to be the collateral litigation exception, without labeling it as such."  However, *CPM Constructors* goes on to specifically note the "important limitation" on the collateral litigation exception that was explicitly recognized in *Gagnon*: "the exception does not apply to attorneys' fees incurred in litigation between the plaintiff and the defendant or persons in privy to the contract agreement or events through which the litigation arises." *Id*. at *10.  These limitations, however, do not prevent recovery of the fees that Integrity incurred in defending against Barrette's claims.

### 2.   Attorney Fees Incurred in Prosecuting the Breach of Fiduciary Duty Claim

Both Eaton Peabody and Integrity acknowledge that under the American Rule governing the award of attorney fees, the Court has the discretion to award fees arising from certain tortious conduct. *See Murphy v. Murphy,* 1997 ME 103, ¶ 15, 694 A.2d 932 (Me. 1997) ("Although a prevailing litigant generally has no right to recover attorney fees, a court may award attorney fees for some kinds of tortious conduct, including a breach of a fiduciary duty." (citation omitted)).  Eaton Peabody emphasizes—but otherwise does not dispute—that an award of attorney fees for certain tortious conduct is discretionary, and that even if the Court discretionarily awards fees connected to Integrity's prosecution of its breach of fiduciary duty claim against Eaton Peabody, Integrity is only entitled to collect fees on "that claim."  ECF No. 108 at 7 n.2 (citing *Advanced Constr.. Corp. v. Pilecki*, 2006 ME 84, ¶ 30, 901 A.2d 189).  Because Eaton Peabody has conceded that Frawley breached the standard of care in prosecuting the patents and breached his fiduciary duty to Integrity, and that Eaton Peabody is vicariously liable for that breach, Integrity is entitled to a discretionary award of attorney fees as a matter of law.

### 3.   Attorney Fees Incurred in Prosecuting the Third-Party Complaint

"The so-called American Rule provides that parties are responsible for their own attorney fees absent a statutory or contractual provision stating otherwise." *Foremost Ins. Co. v. Levesque*, 2007 ME 96, ¶ 6, 926 A.2d 1185.  "Maine follows the American rule . . . ."  *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,*

35

183 F. Supp. 2d 106, 107 (D. Me.), *aff'd,* 311 F.3d 450 (1st Cir. 2002).[19]   A court also has the authority to award attorney fees under "'certain recognized common law authorizations[,]'" including an award of fees "'as damages for certain egregious conduct'" and "for some kinds of tortious conduct." *Baker v. Manter,* 2001 ME 26, ¶ 13, 765 A.2d 583 (first quoting *Linscott v. Foy,* 1998 ME 206, ¶ 16, 716 A.2d 1017, then quoting *Murphy,* 1997 ME 103, ¶ 15, 694 A.2d 932).   Integrity argues that there are two relevant exceptions to the American Rule. First, it urges the Court to find that Eaton Peabody is liable for fees that Integrity has incurred in bringing the Third-Party Complaint—which Integrity argues constitute "consequential damages."  ECF No. 100-1 at 19.  Second, Integrity argues that there is a "bad faith litigation" or "vexatious conduct" exception to the American Rule that should permit it to recover all of the attorney fees that Integrity incurred from prosecuting the Third-Party Complaint.  Eaton Peabody argues that Integrity is not entitled to attorney fees and costs incurred in bringing its Third-Party Complaint because the American rule governing attorney fees precludes a prevailing litigant from recovering fees and costs, and that likewise, it is not entitled to recover attorney fees arising out of this motion practice.

---

[19]  "Federal courts sitting in diversity jurisdiction are constrained in their interpretation of state law," and therefore the Court must determine whether existing Maine law recognizes exceptions to the American Rule.  *Caldwell Tanks, Inc. v. Haley & Ward, Inc.*, 471 F.3d 210, 218 (1st Cir. 2006); *see also Douglas v. York Cnty.*, 433 F.3d 143, 149 (1st Cir. 2005) ("As a federal court sitting in diversity, we try to apply our best understanding of the principles Maine has adopted.  It is not our role to expand Maine law; that is left to the courts of Maine.").

### (a) Attorney Fees as Consequential Damages

Integrity argues that its fees incurred in prosecuting its Third-Party Complaint are "consequential damages" arising from Eaton Peabody's tortious conduct, and that many states are "changing [their attitude to the American Rule] with respect to a civil action arising out of an attorney's professional negligence."[20] ECF No. 100-1 at 19.  This argument is unpersuasive.  The Law Court decision relied upon by Integrity—*Estate of Hoch v. Stifel*, 2011 ME 24, 16 A.3d 137—did not involve a claim for attorney malpractice, nor does it otherwise suggest that the decision was intended to address recoverable consequential damages in attorney negligence cases.

Accordingly, Integrity is not entitled to recover fees and costs as "consequential damages" incurred in litigating its Third-Party Complaint.

### (b) "Bad Faith Litigation" Exception to the American Rule

Integrity also argues that there is a "vexatious conduct" or "bad faith conduct" exception to the American Rule, and contends that this exception entitles it to recover its attorney fees incurred in bringing the Third-Party Complaint.  A federal district court sitting in diversity "possesses inherent power to shift attorneys' fees when parties conduct litigation in bad faith," regardless of whether such fee-shifting is authorized by state law.  *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4-5, 5 n.8 (1st

---

[20] Eaton Peabody challenges Integrity's reliance on *Gagnon* as it relates to Integrity's claims for fees incurred in bringing the Third-Party Complaint, and argues that the rule "does not apply to attorneys' fees incurred in litigation *between the plaintiff and the defendant, . . . or persons in privy to the contract agreement or events through which the litigation arises.*"  ECF No. 108 at 6 (quoting *Gagnon*, 271 A.2d at 635).  But Integrity does not rely on *Gagnon* to support its claim that it is entitled to fees incurred in bringing the Third-Party Complaint—instead, Integrity only relies on *Gagnon* to support its claims for fees incurred defending itself against Barrette's claims, *see supra* p. 34.  Therefore, I need not address Eaton Peabody's argument on this point further.

Cir. 1993) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51-53 (1991)).  This inherent power "should be used sparingly and reserved for egregious circumstances."  *Id.* at 5.  To justify fee-shifting under this exception, "the moving party must demonstrate that the losing party's actions were 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"  *Dubois v. U.S. Dep't of Agric.*, 270 F.3d 77, 80 (1st Cir. 2001) (quoting *Loc. 285, Serv. Emps. Int'l Union v. Nonotuck Res. Assocs., Inc.,* 64 F.3d 735, 737 (1st Cir. 1995)).

Maine law similarly recognizes a limited "bad faith litigation" or "egregious conduct" exception to the American Rule.  *Soley*, 2004 ME 89, ¶ 11, 853 A.2d 755; *Linscott*, 1998 ME 206, ¶ 17, 716 A.2d 1017.  Courts award attorney fees under this exception only in the "most extraordinary circumstances" and "may not [award fees] as a sanction in the absence of significant bad faith on the part of a litigant or his agents." *Linscott*, 1998 ME 206, ¶ 16, 716 A.2d 1017; *see also Chiappetta v. LeBlond*, 544 A.2d 759, 760-61 (Me. 1988).  Because the parties brief this issue based on the Court's inherent fee-shifting authority under federal law, rather than under the analogous state-law exception to the American Rule, I analyze the issue under federal law.

Here, Integrity argues that Eaton Peabody's conduct throughout this litigation was done in bad faith, alleging that:

> From the moment [Eaton Peabody] became aware of a potential claim, [they] had all of Frawley's emails and documents and had access to Frawley to gain an understanding of the nature and extent of his malpractice and subsequent coverup.  Instead of accepting liability, however, they mounted a frivolous defense, denying material allegations in the Third-Party Complaint,

> asserting unsubstantiated affirmative defenses[,] and forcing
> Integrity to incur substantial attorneys' fees to create a record of
> the damning facts known to [them] all along.

ECF No. 100-1 at 23.  Eaton Peabody disputes that its actions in defending the case

rise to the level of bad faith, noting that "[m]istakes were made . . . and [Integrity

was] harmed[,] [b]ut that does not entitle them to an award of discretionary fees, i.e.,

the punishment they seek."[21]   ECF No. 108 at 8.   Eaton Peabody contends that

Integrity has failed to plead any factual allegations that would prove bad faith, and

that summary judgment should therefore be granted on this issue.   ECF No. 108 at

8.

Although Eaton Peabody has conceded liability for breaching the fiduciary

duty it owed Integrity, as well as vicarious liability for the acts and omissions of

Frawley, the record does not establish that Eaton Peabody's conduct during this

litigation represents objective, bad faith abuse of the litigation process or of opposing

parties.  Eaton Peabody's conduct prior to the litigation—including the fact that it

knowingly represented itself as a firm with licensed patent practitioners and failed

to monitor any of Frawley's activities between 2015-2018—may have been objectively

unreasonable.   But that conduct occurred well-before this legal proceeding was

commenced.  Similarly, Frawley's misrepresentations and deceit did not occur in the

course of litigation or in anticipation of litigation.

---

[21]   Eaton Peabody alleges that "[Integrity] rejected the proposal of [Eaton Peabody] to reach a stipulation to avoid the need for motion practice."  ECF No. 108 at 5 n.4.  This potential stipulation is not included in any statement of material fact, nor is it otherwise part of the summary judgment record.  Therefore, I decline to consider it in my analysis of Eaton Peabody's conduct during litigation.

Integrity also argues that there is evidence of bad faith because Eaton Peabody "intentionally withheld its concession of liability . . . until the pre-trial work of the case was largely complete" and then "at the eleventh hour" concedes liability and argues that Integrity and Barrette cannot prove their damages.  ECF No. 100-1 at 16.  Although it is true that Eaton Peabody only conceded its liability in this case more than two years after it was initiated, Integrity has not shown that Eaton Peabody's Answer (ECF No. 15) to the Third-Party Complaint or subsequent legal strategies were "frivolous, unreasonable, or without foundation," *Dubois*, 270 F.3d at 80 (quoting *Nonotuck Res. Assocs., Inc.*, 64 F.3d at 737), beyond the conclusory allegation that Eaton Peabody "had all of Frawley's emails and documents and had access to Frawley."  ECF No. 100-1 at 23.  Viewed in the light most favorable to Integrity, even if Eaton Peabody had access to all of Frawley's communications and had the opportunity to hear Frawley's explanations for his actions, that information alone did not necessarily render Eaton Peabody's conduct unreasonable.  Rather, it may be reasonable for a party in Eaton Peabody's position, as an employer which may be held vicariously liable for the acts of its employees, to not admit liability at the outset and to instead engage in discovery to evaluate the strength of the claims against it, to assess potential defenses, and to evaluate damages.

Integrity also has not offered support for its argument that Eaton Peabody's affirmative defenses—including comparative fault and failure to mitigate damages—were "unsubstantiated" based on the information that Eaton Peabody possessed when the litigation commenced.  ECF No. 100-1 at 23.  Nor do the parties' statements

40

of material fact indicate that Eaton Peabody took other actions to impede the process or efficiency of this litigation.   A party defending against an action—including an action it has reason to know at the outset presents a strong claim—is entitled to engage in the litigation process in a good faith effort to assess the admissibility and strength of the evidence against it on the issues of liability and damages, to examine statutory and other defenses, and to preserve its right to have the dispute ultimately decided by a jury if a settlement is not reached.

Thus, Integrity has not shown that it is entitled to recover attorney fees under the "bad faith exception" to the American Rule or pursuant to the Court's inherent authority to award fees to a prevailing party based on the defending party's bad faith. Integrity also has not shown that the "bad faith exception" applies to its request for attorney fees incurred in responding to the present Motion for Summary Judgment. Although Integrity argues that Eaton Peabody's motion practice "is further evidence of their vexatious litigation conduct that has plagued this case from the outset[,]" as I explained above, the record does not support a finding of bad faith conduct on the part of Eaton Peabody in seeking summary judgment.   ECF No. 100-1 at 25.   Thus, Integrity is not entitled to recover attorney fees that it incurred as a result of opposing Eaton Peabody's motion.

Accordingly, Eaton Peabody is entitled to summary judgment as to the issue of Integrity's attorney fees incurred in prosecuting the Third-Party Complaint and Integrity's attorney fees incurred in opposing the Motion for Summary Judgment.

### 4.      Punitive Damages

Eaton Peabody also seeks summary judgment on Integrity's claim for an award of punitive damages.  Common law awards of punitive damages serve "the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." *Tuttle v. Raymond*, 494 A.2d 1353, 1355 (Me. 1985) (quoting Jane Mallor and Barry Roberts, *Punitive Damages: Toward a Principled Approach*, 31 Hastings L.J. 639, 641 (1980)).  Punitive damages are available upon a showing of actual or implied malice. *Id.* at 1361.  Actual or express malice exists where "the defendant's tortious conduct is motivated by ill will toward the plaintiff." *Id.  See, e.g., Newbury v. Virgin*, 2002 ME 119, ¶ 22, 802 A.2d 413 (holding that defendant's conduct was sufficient to find actual or implied malice when he took multiple actions to put plaintiff out of business and there was evidence of "personal animosity toward [plaintiff] and [plaintiff's] business practices").

Malice may also be implied.  "[W]here deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous," malice can be implied. *Tuttle*, 494 A.2d at 1361. *See Waxler v. Waxler*, 1997 ME 190, ¶ 16, 699 A.2d 1161 (holding that the trial court's finding of malice was clearly erroneous because, among other things, the agent's breach of fiduciary duty and failure to take reasonable steps to address problems he had caused was not "so outrageous that malice can be implied[,]" and "[t]he record is devoid of evidence that [he] had the ability to cure the problems he had created"); *Greenell Corp. v. Penobscot Air Serv., Ltd.*, No. 99-31-P-C, 1999 WL 33117116, at *10 (D. Me. Aug. 19, 1999)

(finding that the defendant's "alleged misrepresentations" involving the "'hiding' of information" and "'lead[ing] [the plaintiff] along'" did not "approach[] the necessary level of outrageous conduct" required to sustain a claim for punitive damages (first alteration in original)).   Generally, acts of fraudulent misrepresentation do not, without more, rise to the level of "outrageous conduct" required for malice to be implied.   *See, e.g.*, *Boivin v. Jones & Vining, Inc.*, 578 A.2d 187, 189 (Me. 1990) (fraudulent misrepresentations did not constitute outrageous conduct).   Similarly, "[i]mplied malice . . . is not established 'by the defendant's mere reckless disregard of the circumstances.'"   *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 16, 818 A.2d 995 (quoting *Tuttle*, 494 A.2d at 1361); *see id.* ¶ 17 (finding that "[a]t best" the defendant "was reckless in drafting and issuing the certificates [of insurance,]" which was not enough to support an implied malice finding).   Nor is grossly negligent conduct sufficient.   *Lehouillier v. E. Coast Steel, Inc.*, 13 F. Supp. 2d 109, 110 (D. Me. 1998).   *See, e.g.*, *Kelleher v. Boise Cascade Corp.*, 683 F. Supp. 858, 860 & n.1 (D. Me. 1988) (finding that evidence showing that the defendant knowingly withheld information about dangerous and unsanitary working conditions from an employee "may indicate that [d]efendant acted recklessly," but that "the factfinder could not imply malice" from the defendant's reckless conduct alone).   Implied malice requires "adequate proof that the defendant acted in a sufficiently culpable manner," *Tuttle*, 494 A.2d at 1359, which may be shown if the defendant made sufficiently outrageous intentional misrepresentations,[22] or if the

---

[22]   *Compare Bratton v. McDonough*, 2014 ME 64, ¶ 26, 91 A.3d 1050 (finding that the defendant "affirmatively represented to [the plaintiffs] that there was no lead in the house when he knew that

defendant knew—or reasonably should have known—that harm would result from his conduct (although this alone is generally not enough to find implied malice).[23]

Thus, in this case the fact that Frawley knew or reasonably should have known that his conduct was likely to harm Integrity is not, standing alone, sufficient to establish that he acted with implied malice. Additionally, even if Frawley made deliberate misrepresentations and intentionally covered up his misconduct, evidence of the nature and manner of this conduct must permit a reasonable factfinder to conclude that Frawley's conduct was not simply reckless or grossly negligent, but was also outrageous.

Integrity argues that malice should be implied from Frawley's misconduct in covering up his gross negligence while knowing that his clients would ultimately be harmed by his actions. ECF No. 100-1 at 7, 24. Integrity asserts that "Frawley knew or should have known that falsifying the Intellectual Property Assignment Agreement and lying to Integrity and True about the status of the patent applications would harm Integrity." ECF No. 100-2 at 2, ¶ 2. Eaton Peabody counters that there is no "clear and convincing evidence that express or implied *malice* motivated the

---

lead was indeed present" and concluding that "[t]he nature of this intentional misrepresentation could be sufficient for a fact-finder to find implied malice"), *with Smith v. Loyd*, No. RE-01-15, 2002 WL 31360644, at *5 (Me. Super. Ct. Sept. 25, 2002) (finding punitive damages unavailable as a matter of law where plaintiff had not alleged any facts of "intentional misrepresentation" in a malpractice claim, and that mere "failure to conduct adequate due diligence in the [p]laintiff's real estate transactions does not rise to the level of intentional outrageous conduct").

[23] *See, e.g.*, *Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 204-05 (1st Cir. 2007) (reversing district court's denial of judgment as a matter of law on punitive damages where an employer's conduct, even if it knew such conduct would significantly hinder employee's job prospects, was not done "with the intent to deprive [the plaintiff] of a job" and thus was not so outrageous as to imply malice).

mistakes or bad conduct."  ECF No. 108 at 8 (citing *Tuttle*, 494 A.2d at 1363-64).

Eaton Peabody alleges that "[n]either Frawley nor Eaton Peabody have at any time

had the desire or intent to do harm to [Barrette] or [Integrity]."[24]  ECF No. 95-2 at 2,

¶ 2.

For reasons I will explain, I conclude that Frawley's conduct in its totality,

viewed in the light most favorable to Integrity, would permit a reasonable factfinder

to conclude that Frawley acted with implied malice.

Although a party must show "clear and convincing evidence" of express or

implied malice at trial, *Staples v. Bangor Hydro-Elec. Co.*, 629 A.2d 601, 604 (Me.

1993), at the summary judgment stage, the test is whether there is a genuine dispute

of material fact as to the existence of express or implied malice, *see Angelica v.

Drummond Woodsum & MacMahon, P.A.*, No. Civ.A. CV-02-15, 2003 WL 22250354,

at *9 (Me. Super. Ct. Sept. 9, 2003).  *See, e.g., Rogers v. MacAdam*, No. Civ.A. CV 01-

667, 2003 WL 21026718, at *1, 4 (Me. Super. Ct. Apr. 2, 2003) (finding sufficient

dispute of fact as to whether malice could be implied from a paralegal's conduct when

her "initial actions were mistakes, serious ones" and she engaged in "schematic

concealment of her increasingly egregious acts," which included lying to the client,

misrepresenting the status of the client's worker's compensation case, forging a

consent decree, and forging a check); *see also Mangan v. Rumo*, 226 F. Supp. 2d 250,

---

[24]  In support of this Eaton Peabody cites to Frawley's testimony describing his relationship with True, in which Frawley details his long-term friendship with True and True's family.  The record citation does not reference Frawley's relationship with Integrity Composites or Integrity Holdings or Barrette.  Nor does it support the statement that Frawley did not have a desire or intent to do harm to True, Integrity, or Barrette.  I therefore accept Integrity's denial of Eaton Peabody's statement.

254 (D. Me. 2002) (addressing defendant's counterclaim for intentional infliction of emotional distress and punitive damages against her former attorney, who she accused of rape, the court held that "perhaps recklessness is what [the plaintiff] is guilty of, but the factfinder will have to hear the facts and circumstances of [his] conduct to determine, by clear  and convincing evidence, whether it reaches the implied malice threshold").

The record does not show that Frawley was motivated by ill will or acted with intent to harm Integrity.  Absent this evidence, the nature and manner of Frawley's intentional misrepresentations and his knowing coverup of his misconduct must rise to the level of "deliberate conduct . . . [that] is so outrageous that malice . . . can be implied." *Tuttle*, 494 A.2d at 1361.

Frawley undoubtedly acted with reckless disregard for his fiduciary duties throughout the course of his dealings with Integrity, and his conduct fell far below the standards of professionalism required of attorneys.  He knowingly submitted incomplete patent applications in a specialized area of law for which he was not fully licensed to practice.  After filing, he did not follow-up on the applications in any manner to determine their status.  Although he claims not to have received the notice of deficiencies, a factfinder might well conclude that he received the notice but took no action.  In addition, a factfinder could conclude that Frawley, by falsely holding himself out to be a skilled patent professional, and then carelessly pursuing Integrity's patent applications, demonstrated a reckless disregard for the fiduciary duties he owed his client.  A factfinder might also conclude that Frawley knew or

reasonably should have known that his deliberate misrepresentations to Integrity and his prolonged concealment of his misconduct were likely to result in harm to Integrity.

Frawley's initial conduct certainly constituted a failure to exercise due diligence, and was arguably grossly negligent or reckless, but that alone does not constitute outrageous conduct that would allow malice to be implied. These circumstances also cannot be compared to those cases in which the outrageous nature of conduct is plainly obvious due to the egregious level of risk posed to human life and safety.[25] This does not end the inquiry, however, because Frawley's conduct must be viewed as a whole, including the conduct related to his alleged coverup of his misdeeds. Here, there is a genuine dispute as to the existence of implied malice based on this aspect of Frawley's conduct. Frawley realized in June of 2018 that he had never filed the second patent application, yet he expressly misrepresented its status in communications with Integrity and Barrette. He subsequently repeated that misrepresentation by memorializing the incorrect date in the Intellectual Property Assignment Agreement that he prepared for his client, Integrity. Although he testified that "he does not know *why* he listed the filing date . . . as June 15, *2017*,"

---

[25] *See e.g.*, *Graham v. Brown*, 2011 ME 93, ¶ 13, 26 A.3d 823 (upholding punitive damages award on claim for intentional infliction of emotional distress based on a finding of outrageous conduct involving "numerous incidents of abuse and resulting injuries" inflicted by former boyfriend of plaintiff); *Butterfield v. Saucier*, No. Civ.A. CV-01-466, 2003 WL 21018866, at *3-4 (Me. Super. Ct. Mar. 20, 2003) (finding outrageous conduct when defendant led police on a high-speed chase, crashed into a concrete wall, and plunged his truck into a river, and subsequently misdirected rescuers while his passenger drowned underneath the truck); *Lehouillier*, 13 F. Supp. 2d at 112 (holding that "a factfinder could reasonably find by clear and convincing evidence that, rather than recklessly disregarding the circumstances, [the defendant], by knowingly and affirmatively creating a hidden, life-threatening situation . . . in violation of the specific terms of its permit and of the law, engaged in conduct which can be properly characterized as outrageous").

ECF No. 100-2 at 21 (first emphasis added), he nonetheless filed the second application—exhibiting the same deficiencies as the first application—with the Patent Office and knowingly listed the incorrect filing date on the final Intellectual Property Assignment Agreement. Thus, despite Frawley's knowledge of his error—an error which he could reasonably assume would prove harmful to his clients if it was not remedied—he actively concealed his misconduct for almost a year. Integrity did not learn of Frawley's deceit until desAutels informed True about the terminated applications in June 2019. This delay deprived Integrity of the opportunity to rectify Frawley's misconduct in a timely manner.

Frawley's effort to coverup his misdeeds, when viewed in the light most favorable to Integrity, could permit a reasonable factfinder to conclude that his misconduct transcended the bounds of reckless disregard for the circumstances into the realm of outrageousness because Frawley's initial professional negligence escalated into a series of fraudulent misrepresentations and outright lies. *Rogers*, 2003 WL 21026718, at *4 (concluding that the defendant's fraudulent misrepresentations, lies, and concealment could "amply be described as outrageous"). Accordingly, Eaton Peabody is not entitled to summary judgment on the issue of punitive damages because there is sufficient record evidence to support a finding of implied malice.

### III. CONCLUSION

For the reasons set forth above, it is **ORDERED** that Eaton Peabody's Motion for Summary Judgment (ECF No. 95) is **GRANTED IN PART** as to:

A. Barrette's claims for compensatory damages and claims for consequential damages arising from any lost sales or damage to reputation (ECF No. 1); and

B. Integrity's claims for attorney fees incurred in prosecuting its Third-Party Complaint and claims for attorney fees incurred in opposing the Motion for Summary Judgment (ECF No. 12).[26]

The Motion for Summary Judgment is **DENIED** in all other respects.  It is further **ORDERED** that Eaton Peabody's Motion in Limine (ECF No. 79) is **GRANTED IN PART** as to desAutels's opinion testimony as to the value of the DuraLife Step-Clip patent application and **DENIED IN PART** as to desAutels's opinion about the Competitor Step-Clip patent application value.

The Clerk's Office is directed to schedule a case management conference with the parties to address all outstanding issues.

**SO ORDERED.**

**Dated this 31st day of March 2023.**

_____
**/s/ Jon D. Levy**
**CHIEF U.S. DISTRICT JUDGE**

---

[26] This does not include the fees that Integrity incurred in bringing its claim for breach of fiduciary duty.